**UNITED STATES of America, Plaintiff,**

**v.**

**Christ SAVIDES, Defendant.**

**No. 87 CR 17.**

United States District Court,
N.D. Illinois, E.D.

April 20, 1987.

Anton R. Valukas, U.S. Atty. by William J. Cook and Thomas Knight, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Edward M. Genson, Terence P. Gillespie, Genson, Steinback & Gillespie, Chicago, Ill., for defendant.

## ORDER

BUA, District Judge.

This order concerns defendant's motions to suppress evidence and motion to revoke a pretrial detention order. For the reasons stated herein, defendant's motions are denied.

### I. FACTS

In February 1987, a grand jury returned a two-count indictment charging defendant Christ Savides with possession and intent to distribute over 10 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). The indictment stemmed from the execution of two search warrants pursuant to which quantities of substances containing cocaine were recovered from an apartment and office maintained by Savides.[1] The first search warrant was issued by a Cook County Circuit Court Judge on March 8, 1986 based on the finding that probable cause existed to believe a gambling "wire room" operation was being conducted out of Savides' apartment in Park Ridge, Illinois. Executing the search warrant, Chicago police officers seized gambling paraphernalia, six firearms, 10 kilograms of cocaine, and $65,000 in cash from Savides' residence. Savides along with three other individuals present in the apartment at the time of the search were arrested and charged with violations of state narcotics laws. Subse-

quently, Savides was released on $70,000 bond pending trial on the state charges.

On January 8, 1987, Assistant United States Attorney Thomas Knight presented a search warrant affidavit prepared by Drug Enforcement Administration (DEA) Agent William Morley to Magistrate Weisberg. In the affidavit, Morley alleged that Savides maintained an office in a building located at 1400 Renaissance Drive in Park Ridge, Illinois for the purpose of storing and distributing narcotics. According to the affidavit, Chicago police officers conducting surveillance on Savides after his March 1986 arrest observed Savides driving almost daily in an evasive fashion to the 1400 Renaissance Drive Building. A light in Room 102 of that building would go on shortly after Savides' arrival and go out shortly before Savides' departure. On one occasion, surveillance agents observed Savides using a key to enter the room in question. A check with various telephone companies revealed no telephone subscriber for Room 102.

The surveillance agents reported that Savides would frequently use a public telephone outside the 1400 Renaissance Drive Building prior to entering or after leaving Room 102. After leaving the building, Savides routinely made a number of stops at various places in the Chicago area such as restaurants, bars, motels, hot dog stands, business buildings, and currency exchanges. Though sometimes stopping long enough to eat or drink, Savides usually remained in the places for a brief period of time or simply met with a person in a parking lot. The surveillance officers then go on to describe in detail certain occurrences they witnessed while observing Savides. These included meetings with several individuals believed by the DEA to be major traffickers of narcotics.

The affidavit then indicates that unidentified informants told DEA agents that a certain Robert Wilson supplied Savides with cocaine. Robert Wilson was observed on April 3, 1986, less than a month after

---

1. Count I of the indictment charges Savides with possession and intent to distribute 10 kilograms of cocaine recovered from his apartment on March 8, 1986. Count II charges Savides with possession and intent to distribute 200 grams of cocaine recovered on January 8, 1987 from an office allegedly used by Savides.

Savides' arrest, leaving the parking garage of Savides' apartment building in Savides' car. Wilson met with a Donald Smith at a nearby restaurant and received a brief case from Smith. Wilson was stopped by police officers when he returned to Savides' building and a search ensued. In the trunk of Savides' car, police retrieved the brief case which was later shown to contain 10 kilograms of cocaine. An analysis of Savides' phone records showed calls had been placed prior to Savides' arrest to a phone associated with Smith in the Florida Keys. Finally, the affidavit recites statements by Paul Meegan, a former associate of Savides. Meegan told DEA agents that Savides and his partner regularly supplied him with cocaine. Specifically, Meegan informed DEA agents that Savides and his partner sold Meegan as much as a million dollars of cocaine during a one-year period. Meegan disclosed that it was his impression that Savides was the one who had the connections to maintain a supply of cocaine.

Upon being presented with an affidavit for a search warrant containing the above-mentioned information, Magistrate Weisberg studied it and expressed doubt as to whether probable cause existed to search the office at 1400 Renaissance Drive. Assistant U.S. Attorney Knight told the magistrate he believed case law supported issuance of a warrant and informed the magistrate time was of the essence for the government. Magistrate Weisberg and Knight then separated two times while the magistrate and his law clerk researched and discussed the probable cause issue. Magistrate Weisberg then informed Knight that he believed the affidavit of DEA Agent Morley did not establish probable cause and denied the application for a warrant having a minute order entered to that effect. At that point, either the magistrate or Knight raised the issue of whether the same affidavit could be presented to another judge. Magistrate Weisberg expressed the belief that denial of the application for the search warrant did not preclude the government from resubmitting the very same affidavit to another judge, although no new grounds were being offered for resubmission.

After leaving Magistrate Weisberg, Knight proceeded to the offices of Chief Magistrate James T. Balog. Knight advised Chief Magistrate Balog that Magistrate Weisberg said he had no objection to another magistrate reviewing the affidavit. Chief Magistrate Balog stated that since Magistrate Weisberg did not object to the review, he would examine the affidavit. After reviewing the affidavit, Chief Magistrate Balog authorized the execution of the search warrant for Room 102 of 1400 Renaissance Drive, Park Ridge, Illinois.

Executing the search warrant of Room 102, DEA agents recovered 200 grams of cocaine, small and large plastic bags, small envelopes, a razor, a small cocaine "testing" spoon, a balance beam scale and several empty kilogram boxes. DEA agents also assert that Savides' fingerprints were found in 18 locations in the office.

## II. DISCUSSION

Savides presents this court with three motions. First, Savides moves to quash the search warrant issued on March 8, 1986 by a state court judge and suppress the 10 kilograms of cocaine recovered from his apartment on the grounds that the facts stated in the supporting search warrant affidavit were fabricated by the affiant police officer. Second, Savides motions to quash the search warrant issued on January 8, 1987 by Chief Magistrate Balog and suppress the 200 grams of cocaine recovered from Room 102 on the grounds that the initial denial of the search warrant by Magistrate Weisberg equitably estopped the government from submitting the same application to a second judicial officer. Finally, Savides motions this court for an order revoking the pretrial detention order issued by Magistrate Weisberg on January 16, 1987. These motions will be addressed in turn.

■ On February 17, 1987, this court held a hearing to determine whether an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), was required. According to *Franks*, an evidentiary hearing is required when a defendant makes a sub-

stantial preliminary showing that a false statement was knowingly and intentionally or with reckless disregard for the truth included by an affiant in a search warrant affidavit, and the alleged false statement is necessary to the finding of probable cause. *Id.* at 155–56, 98 S.Ct. at 2676. To mandate a *Franks* hearing, the defendant's attack must be more than conclusory and must be supported by more than a sincere desire to cross examine. *Id.* at 171, 98 S.Ct. at 2684. Essentially, the allegations of deliberate falsehood or of reckless disregard for the truth must be supported by a substantial offer of proof before the requirement to hold the hearing arises. *Id.*

In the present case, Savides attacks the search warrant issued by the state court judge on the grounds that the affiant police officer completely fabricated the facts contained in the search warrant affidavit. A review of the affidavit submitted to the state court judge shows that the affiant police officer and his partner were sitting in an undisclosed place when they witnessed a man walk up to a pay telephone, pull out a betting form, dial a phone number and begin to place wagers on basketball games. The police officers then approached the man, who is not named in the affidavit, identified themselves and asked the man what had transpired on the phone. The unidentified man told the officers he had placed a bet with his bookmaker. The police officers asked the man if he would call again and place another wager. The man, after receiving assurance he would not be arrested if he cooperated, agreed to allow the officers to observe him dial two different numbers, identify himself, and place wagers. One of the two phone numbers the man dialed was subsequently traced through phone company records to Christ Savides at his Park Ridge apartment.

To substantiate Savides' claim that the occurrence described in the search warrant affidavit was fabricated, Savides submitted copies of several search warrant affidavits previously prepared by the two police officers in which similar encounters with unnamed men placing phone calls to bookmakers are described. After hearing the parties' oral arguments and reviewing the materials presented by Savides, this court found that sufficient differences existed between the prior affidavits and the one supporting the March 8, 1986 search warrant to dispell any fear of fabrication. Thus, this court ruled Savides failed to make the substantial preliminary showing required for a *Franks* hearing and denied Savides' motion to quash the search warrant and suppress the seized cocaine.

On February 18, 1987, this court allowed Savides to submit additional evidence on the *Franks* issue. Among the items subsequently filed by Savides were additional "similar" search warrant affidavits prepared by the two police officers, transcripts of court proceedings in which search warrants based on the two police officers' affidavits were held invalid for vagueness, and an affidavit by Savides stating he never accepted a wager over the number indicated in the search warrant affidavit.

Unfortunately, an examination of these additional documents does not lead this court to a different conclusion. The similarity among the affidavits prepared by the two officers is merely indicative of a standard investigative approach employed by gambling unit officers to obtain grounds for gambling search warrants. The fact search warrants based on some of these affidavits were subsequently held invalid for vagueness does not support the conclusion that the encounter described in the instant affidavit is a fabrication. The contention a search warrant is void for vagueness is completely distinct from the assertion a search warrant is premised on fabricated facts. Finally, Savides' sworn statement that he did not accept bets on his apartment phone fails to persuade this court that the affiant police officer merely invented the incident described in the affidavit to obtain the search warrant. As such, this court finds the substantial preliminary showing required for a *Franks* hearing has not been established. Thus, Savides' motion to quash the search warrant and suppress the evidence relating to Count I of the indictment is denied.

Savides next attacks the search warrant issued on January 8, 1987 for Room 102 at

1400 Renaissance Drive, asserting that Magistrate Weisberg's initial denial of the search warrant equitably estopped the government from submitting the identical application to Chief Magistrate Balog for consideration. Savides takes the position that the initial denial of probable cause by one magistrate operated as a final order precluding a second judicial officer from considering the same application without additional evidence to support a different conclusion. Savides bases his argument on the decision in *United States v. Davis*, 346 F.Supp. 435, 442 (S.D.Ill.1972). In *Davis*, after a magistrate denied a search warrant, the government presented the same application to a second magistrate, informing the latter of the initial denial. *Id.* Responding to the defendant's challenge of the procedure used to obtain the warrant, the court ruled the government was equitably estopped from presenting the identical application to the second magistrate because the first determination operated as a binding judicial decision. Ruling that the first magistrate's ruling precluded consideration by the second magistrate, the court quashed the warrant and suppressed the evidence seized. *Id.*

Aside from *Davis*, Savides argues that the principles of collateral estoppel and res judicata support the position that once a magistrate denies the issuance of a search warrant, the government cannot obtain issuance of a warrant based on the same probable cause showing. According to Savides, application of these principles to the instant case will end the despicable practice of forum shopping, advance consistent judicial determinations, and promote judicial economy. Savides asserts that application of estoppel and res judicata principles to the instant case will result in a minimal burden on law enforcement officials. After a magistrate denies a search warrant, the government need only bolster its probable cause showing before again seeking issuance of the warrant. As such, Savides urges this court to quash the search warrant and suppress the evidence.

▬ The linchpin of the *Davis* holding and a prerequisite to applying principles of collateral estoppel and res judicata are the existence of a final decision on the merits.

An essential element to a final order is appealability. Principles of res judicata and collateral estoppel preclude the same parties from relitigating identical issues in courts of first impression partly because an appellate process exists to correct legal error committed below. Unless parties are accorded the right to appeal the judgment of a judicial officer, the decision is not final and collateral estoppel and res judicata principles do not apply.

▬ A probable cause determination on an application for a search warrant by a magistrate is not a final order. Simply stated, the government has no right to appeal if it believes the magistrate erred in denying the warrant. Applying principles of collateral estoppel or res judicata to the denial of a search warrant would be similar to applying the principles to the decision of a grand jury to indict after a magistrate has dismissed a complaint for lack of sufficient evidence. In the latter case, the law is clear that the refusal of a judicial officer to sustain a criminal complaint does not preclude a grand jury from subsequently hearing the same evidence and returning an indictment so long as the grand jury is informed of the first's decision. *See United States v. Kysar*, 459 F.2d 422, 423–24 (10th Cir.1972). In light of the fact that Magistrate Weisberg's initial denial of the search warrant for Room 102 was not a final order, this court is unable to find principles of collateral estoppel or res judicata relevant. This court believes that like a situation where a judicial officer fails to sustain a criminal complaint at a preliminary hearing, the initial denial of a warrant does not preclude the government from presenting the same evidence to a second judicial officer so long as the government makes known the application was previously denied.

▬ For the same reasons, this court is unable to follow *Davis*. The premise of the court's ruling in *Davis* was that the magistrate's determination of probable cause was a final order. For the reasons stated earlier, this court is unable to accept such a conclusion. Moreover, this court does not believe that the government's actions in

obtaining the Room 102 warrant was tantamount to forum shopping. Had the government visited numerous magistrates before convincing one to issue the disputed warrant, allegations of forum shopping would be appropriate, and application of the doctrine of equitable estoppel proper. However, the foregoing facts reveal no indicia of bad faith on the part of the government and application of the exclusionary rule would not deter any improper conduct. Thus, this court rejects Savides' estoppel argument.

Savides also raises two related arguments regarding Count II. First, Savides argues that the affidavit of DEA Agent Morley does not contain sufficient evidence to support a finding of probable cause. Second, Savides asserts that Agent Morley willfully omitted material information from the search warrant affidavit which, if included, would have dictated a finding that probable cause did not exist. Savides thus contends the warrant must be quashed under the principles in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

█ Viewing the facts recited in Agent Morley's affidavit, this court entertains no doubt that probable cause existed to issue the warrant for Room 102. Savides' almost daily ritual of driving in an evasive manner to 1400 Renaissance Drive, remaining in the building a short time, placing calls on an outdoor pay phone and then stopping briefly at restaurants, bars, motels, parking lots, and currency exchanges, coupled with the fact he had been arrested in March 1986 for possession with intent to distribute 10 kilograms of cocaine, clearly supports the existence of probable cause. Additional information in the affidavit concerning Savides' association with known cocaine traffickers, the statements of Paul Meegan, and the arrest of Robert Wilson in Savides' car with 10 kilograms of cocaine supplement the conclusion Savides was using Room 102 to store and distribute cocaine. Thus, Savides' argument that the affidavit of Agent Morley failed to state probable cause for the search of Room 102 is dismissed.

█ Savides' final attack on the January 8, 1987 search warrant is based on the allegation that certain key facts were intentionally or recklessly omitted from the Morley affidavit which, if included, would have negated the existence of probable cause. According to Savides, three material omissions existed in the affidavit. First, Savides contends that Chief Magistrate Balog was not informed of the fact Magistrate Weisberg had earlier denied the same application for the warrant. Second, Savides complains that while the affidavit alleges he entered the home of a friend with a suspicious-looking bag, the affidavit fails to disclose that a subsequent search of the home uncovered no significant quantities of cocaine. Third, Savides asserts Agent Morley failed to note that Savides had been detained on January 7, 1987 while a search of his car and person proved unfruitful. In light of the foregoing omissions, Savides urges this court to quash the search warrant pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Some dispute appears to exist on the issue of whether Chief Magistrate Balog was told by Knight that Magistrate Weisberg had previously denied the search warrant. Knight states that he informed the Chief Magistrate, while Savides argues that Knight's earlier statements indicate he did not. Nevertheless, the parties appear to agree that Chief Magistrate Balog was advised that Magistrate Weisberg had reviewed the affidavit without issuing the warrant and that the magistrate had no objection to having a second magistrate examine the same application for probable cause.

First, this court does not believe that Knight is misrepresenting the fact that he told Chief Magistrate Balog that Magistrate Weisberg failed to find probable cause on the same application. Savides' argument that Knight's statements contain inconsistencies on this point are resolved by the fact that Knight was unaware at the time that Magistrate Weisberg entered a minute order denying the search warrant the day after their meeting. Although Knight did not realize the magistrate was going to enter a formal order, he did understand that Magistrate Weisberg did not

believe probable cause was stated in the application. Even if limited to the portion of evidence upon which the parties agree, this court believes that Chief Magistrate Balog was sufficiently informed of the earlier denial of probable cause and took that factor into account in making his decision to issue the warrant. Even assuming Knight had not explicitly disclosed the initial denial, certain facts existed which must have made it clear to the Chief Magistrate that the application was previously denied. Here, the Chief Magistrate was presented with an application bearing the name of another magistrate and informed that the first magistrate had no objection to a second judicial officer reviewing the same affidavit. This court believes that under such circumstances, the Chief Magistrate was sufficiently informed of the prior disposition before Magistrate Weisberg and considered that fact when he approved the warrant. Thus, Savides' first allegation of omission does not dictate the search warrant be quashed.

The final two alleged omissions in the affidavit also do not require invalidation of the warrant. This court simply does not believe the absence of these two facts has any impact on the probable cause finding. Accordingly, Savides' motions to quash and suppress are denied with regard to Count II of the indictment.

▇▇▇ The last motion presented by Savides concerns his request for revocation of Magistrate Weisberg's order detaining him without bond prior to trial. On January 16, 1987, after a two-day hearing, Magistrate Weisberg determined pursuant to 18 U.S.C. §§ 3142(e) and (g) that no conditions or combination of conditions could reasonably assure the safety of the community if Savides was released. According to § 3142(e) of the Bail Reform Act, once a probable cause exists to believe a defendant has violated certain federal narcotics laws, a rebuttable presumption arises that no condition or set of conditions exist which reasonably could assure the safety of the community if the defendant is released. 18 U.S.C. § 3142(e). The production of some evidence by the defendant that he is not dangerous requires the magistrate to consider the presumption together with other relevant considerations set forth in § 3142(g)[2] before coming to the conclusion of whether bail should be allowed. *United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir.1986). Once such evidence has been produced by the defendant, the magistrate cannot point solely to the presumption as clear and convincing evidence that bail must be denied. Some clear and convincing independent evidence of dangerousness must exist.

Savides argues that the magistrate erred in denying him bail because the magistrate failed to properly apply the § 3142(e) presumption once Savides presented evidence he did not pose a risk to the community. Savides asserts that the magistrate simply gave the presumption conclusive weight and failed to properly balance the evidence before him. As such, Savides requests his detention order be vacated.

▇▇▇ Initially, this court notes that Savides' request for revocation of the detention order will be reviewed *de novo. See United v. Cox,* 635 F.Supp. 1047, 1051 n. 5 (D.Kan.1986) (collecting cases). The magnitude a pretrial detention order has on a

**2.** Section 3142(g) provides that, in determining whether there are conditions which will reasonably assure the defendant's appearance in court and the safety of the community, the court may assess the following information:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
(2) the weight of the evidence against the person;
(3) the history and characteristics of the person, including—
  (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
  (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State, or local law; and
(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.... 18 U.S.C. § 3142(g).

defendant requires the district court to review a denial of bail through an independent eye without simply deferring to the magistrate's determination. *Id.* Moreover, the district court may consider evidence not previously submitted to the magistrate to determine whether the detention order should be revoked. *Id.* In support of his request for revocation, Savides offers certain evidence concerning his personal history and characteristics. This evidence can be summarized as follows:

(1) Two individuals who know Savides state that he is even tempered, reliable, and a good father who has been respectful of court dates in the past. One of Savides' witnesses has offered to pledge her home as surety for Savides' bond.

(2) A car dealership has agreed to employ Savides once he is released on bond.

(3) Savides states he has lived and worked in the Chicago area all his life and has three daughters in Chicago.

(4) Savides indicates that his criminal background is minimal. He admits to being convicted of robbery 35 years ago.

(5) The magistrate found Savides posed no flight risk.

(6) Savides' physician states that Savides suffers from cluster headaches, which is the most severe form of headache pain known. The physician notes that during these headache attacks, Savides is required to breathe through an oxygen mask for three to five minutes to reduce the pain. Savides asserts oxygen has not been made available to him at the Metropolitan Correctional Center (MCC).

(7) The pretrial services officer who interviewed Savides recommends he be released on bond.

Finally, Savides asserts that weight of evidence against him is weak since most of the evidence presented at the magistrate's hearing took the form of hearsay. As such, Savides argues the § 3142(g) factors weigh in favor of his release.

Analyzing the foregoing information, this court believes Savides has rebutted the presumption of dangerousness. Thus, this court turns the government's proffer under § 3142(g) to determine whether clear and convincing evidence shows Savides remains unreasonably dangerous to the community. The government first argues that the weight of evidence against Savides is overwhelming. The government notes that Savides was arrested with 10 kilograms of cocaine in his apartment together with 6 handguns and $65,000 in cash. A month after his March arrest, a search of Savides' car, driven at the time by Robert Wilson, uncovered 10 additional kilograms of cocaine. Moreover, the search of Room 102 retrieved 200 grams of cocaine along with drug paraphernalia. DEA agents report that Savides' fingerprints were found in 18 locations in the office, clearly linking Savides to the cocaine. Thus, the government argues that aside from the vast amount of hearsay evidence from Savides' associates, the weight of evidence clearly militates against his release.

Regarding the factors listed under § 3142(g)(3)(A), the government observes that although Savides asserts he has strong family ties, Savides is divorced, and his wife has custody of their children. The pretrial services report shows Savides owns no real estate and complains of debts totaling over $100,000. The government also suggests that the MCC is capable of providing Savides with the oxygen prescribed for his headache condition.

The last issue raised by the government concerns Savides' compliance with court orders under § 3142(g)(3)(B). The government notes that Savides' assurances he will obey court orders and appear when ordered should be given little consideration by this court. The government contends that this assurance was undoubtedly given by Savides to the state court when he was released on bond in March 1986. According to the government, Savides assured the state court he would avoid criminal activity and criminal associates during the pendency of his state court case. Nevertheless, within weeks of his release from state custody, 10 kilograms of cocaine was taken from the car he used. Thereafter, surveillance agents observed Savides meeting known drug dealers under highly suspicious circumstances which suggested by Savides was again delivering narcotics.

This surveillance caused agents to focus on Room 102 as the probable location of Savides' secret storehouse and led to the successful search of this room in January 1987. Summarizing the foregoing facts, the government argues that such a pattern of criminal behavior shows that Savides entertains little respect for release orders and their conditions. Based on the type of offense charged, the weight of evidence supporting the charges, and Savides' disinclination to obey orders of the court, the government argues clear and convincing evidence exists to support the detention.

 Reviewing the evidence presented by both sides, this court is inclined to affirm the detention order. Although Savides' evidence relating to the factors listed in § 3142(g)(3)(A) rebutted the presumption of dangerousness, a balancing of all relevant considerations in this case compels the conclusion that Savides continues to present an unreasonable threat to the community. The evidence in this case clearly shows that while Savides was free on bond in the state case, he continued to engage in unlawful activity. Savides' daily trips to Room 102 followed by his brief stops at restaurants, bars, parking lots, and currency exchanges leads this court to believe he continued to traffic narcotics after receiving bail from the state court up to the time he was arrested in connection with the present charges. The recovery of 200 grams of cocaine from Room 102 is clear and convincing evidence that Savides has no respect for the orders of that court. Although little likelihood exists that Savides will flee if released, Savides' disregard for the conditions of his state court bail weighs greatly against granting bail in the instant case. Balancing the evidence presented by Savides against the considerations articulated by the government, this court is unable to revoke Savides' detention order. The size

and duration of Savides' drug trafficking operations, the amount of cocaine seized, the dangerous weapons found in his apartment, and the unwillingness of Savides to cease unlawful activity while on bail from a state court proceeding represents clear and convincing evidence that no set of conditions exist which would reasonably assure the safety of the community if Savides was released. Thus, Savides' motion to revoke the detention order is denied.[3]

### III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress evidence is denied, and defendant's motion to revoke his pretrial detention order is denied.

IT IS SO ORDERED.

---

**3.** Savides also challenges the constitutionality of the pretrial detention provisions of the Bail Reform Act of 1984. This same challenge was raised and rejected by the Seventh Circuit in *U.S. v. Portes*, 786 F.2d 758, 766 to 768 (7th Cir.1985), and by the First, Third, Ninth and Eleventh Circuits. *See U.S. v. Zannino*, 798 F.2d 544 (1st Cir.1986); *U.S. v. Perry*, 788 F.2d 100 (3d Cir.1986); *U.S. v. Walker*, 808 F.2d 1309 (9th Cir.1987); and *U.S. v. Rodriguez*, 803 F.2d 1102 (11th Cir.1986). The Second Circuit is the only circuit that has held otherwise and their position is being reviewed by the Supreme Court. *See U.S. v. Salerno*, 794 F.2d 64 (2d Cir.) *cert. granted* — U.S. ——, 107 S.Ct. 397, 93 L.Ed.2d 351 (1986). Thus, Savides' due process challenge is contrary to the law in our circuit and must be dismissed.